**No. 22-51069**

# In The
# United States Court of Appeals
# for the Fifth Circuit

NATIONAL ASSOCIATION OF MANUFACTURERS;
NATIONAL GAS SERVICES GROUP,
INCORPORATED,

*Plaintiffs–Appellants,*

v.

UNITED STATES SECURITIES AND EXCHANGE
COMMISSION; GARY GENSLER, IN HIS OFFICIAL
CAPACITY AS CHAIR OF THE SEC,

*Defendants–Appellees.*

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS

**BRIEF OF CHAMBER OF COMMERCE OF THE UNITED STATES OF
AMERICA AND BUSINESS ROUNDTABLE AS AMICI CURIAE
SUPPORTING PLAINTIFF-APPELLANT AND REVERSAL**

Jordan L. Von Bokern
Tyler S. Badgley
U.S. CHAMBER
LITIGATION CENTER
1615 H Street, N.W.
Washington, D.C.  20062
(202) 463-5337

Jeffrey B. Wall
Elizabeth A. Rose
Leslie M. Arffa
Stephanie M. Kelly
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C.  20006
(202) 956-7500

Matthew A. Schwartz
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
(212) 558-4000

January 13, 2023

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the Chamber of Commerce of the United States of America and Business Roundtable state that they are not subsidiaries of any other corporation.  Amici are nonprofit trade groups that have no shares or securities that are publicly traded.[1]

---

[1]  The parties have consented to the filing of this brief.  *See* Fed. R. App. P. 29(a)(2).  No counsel for a party authored this brief in whole or in part and no entity or person, aside from *amici curiae*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.  *See* Fed. R. App. P. 29(a)(4)(E).

# TABLE OF CONTENTS

STATEMENT OF IDENTITY ............................................................1

INTRODUCTION ............................................................................3

BACKGROUND ..............................................................................7

    A.   PVABs Exercise Enormous Influence Over Corporate Decisionmaking ......................................................................7

    B.   PVAB Advice Contains Notable Deficiencies.................................9

    C.   The Commission Embarked On A Decade-Long Effort To Craft Appropriate Regulations for PVABs, Culminating In The 2020 Rule ...........................................................................13

    D.   A New Majority On The Commission Illegally Refused to Enforce The 2020 Rule, And Then Promulgated The 2022 Rescission On An Artificially Truncated Timeline........................16

ARGUMENT ..................................................................................19

I.    The District Court Erred In Concluding That The 30-Day Comment Period Did Not Deprive The Public Of A Meaningful Opportunity To Comment........................................19

II.   The District Court Erred In Concluding That The Commission Adequately Explained Its Change In Position............24

    A.   The Commission's Conclusory Justifications For The 2022 Rescission Are Insufficient..........................................27

    B.   The Commission Ignored The Costs On Public Companies Of Rolling Back The 2020 Rule .......................................31

III.  The District Court Also Erred In Failing To Set Aside Note (e) .............................................................................................33

CONCLUSION................................................................................34

**CERTIFICATE OF COMPLIANCE** ...............................................................36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AARP* v. *U.S. Equal Emp't Opportunity Comm'n*,
267 F. Supp. 3d 14 (D.D.C. 2017) ...................................................................29

*ACA Int'l* v. *Fed. Comm'n*,
885 F.3d 687 (D.C. Cir. 2018)........................................................................36

*Am. Textile Mfrs. Inst., Inc.* v. *Donovan*,
452 U.S. 490 (1981)........................................................................................29

*Becerra* v. *U.S. Dep't of the Interior*,
381 F. Supp. 3d 1153 (N.D. Cal. 2019)...........................................................23

*Business Roundtable* v. *SEC*,
647 F.3d 1144 (D.C. Cir. 2011)......................................................................34

*Cath. Legal Immigr. Network, Inc.* v. *Exec. Off. for Immigr.*
*Rev.*, 2021 WL 3609986 (D.D.C. Apr. 4, 2021)...................................21, 24, 25

*Centro Legal de la Raza* v. *Exec. Off. for Immigr. Rev.*,
524 F. Supp. 3d 919 (N.D. Cal. 2021)..............................................................25

*Coal. for Workforce Innovation* v. *Walsh*,
2022 WL 1073346 (E.D. Tex. Mar. 14, 2022) ................................................21

*Dep't of Homeland Sec.* v. *Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) .........................................................................7, 26, 29

*Est. of Smith* v. *Bowen*,
656 F. Supp. 1093 (D. Colo. 1987) .................................................................21

*FCC* v. *Fox Television Stations, Inc.*,
556 U.S. 502 (2009)........................................................................................26

*Greene Cnty. Planning Bd.* v. *Fed. Power Comm'n*,
455 F.2d 412 (2d Cir. 1972) ...........................................................................30

*Institutional Shareholder Services Inc.* v. *SEC,*
    No. 19-cv-3275 (D.D.C. June 1, 2021) .............................................................17

*Michigan* v. *EPA,*
    576 U.S. 743 (2015)..............................................................................................7

*Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins.*
    *Co.,* 463 U.S. 29 (1983) ......................................................................................27

*N. Carolina Growers' Ass'n* v. *United Farm Workers,*
    702 F.3d 755 (4th Cir. 2012)...................................................................6, 21, 23

*Nat'l Ass'n of Home Builders* v. *Defs. of Wildlife,*
    551 U.S. 644 (2007)........................................................................................27, 31

*Nat'l Ass'n of Mfr.* v. *SEC,*
    No. 7:21-cv-183 (W.D. Tex. Sept. 28, 2022)....................................................17

*Nat'l Lifeline Ass'n* v. *Fed. Commc'ns Comm'n,*
    921 F.3d 1102 (D.C. Cir. 2019).........................................................................20

*Organized Vill. of Kake* v. *USDA,*
    795 F.3d 956 (9th Cir. 2015)..............................................................................28

*Pangea Leg. Servs.* v. *U.S. Dep't. of Homeland Sec.,*
    501 F. Supp. 3d 792 (N.D. Cal. 2020)..........................................................22, 24

*Rural Cellular Ass'n* v. *FCC*
    588 F.3d 1095 (D.C. Cir. 2009)..........................................................................20

*Susquehanna Int'l Grp.* v. *SEC,*
    866 F.3d 442 (D.C. Cir. 2017)............................................................................30

*Texas* v. *United States,*
    809 F.3d 134 (5th Cir. 2015)............................................................................5, 6

*United States* v. *Johnson,*
    632 F.3d 912 (5th Cir. 2011).............................................................................21

*U.S. Steel Corp.* v. *EPA,*
    595 F.2d 207 (5th Cir. 1979)...............................................................................6

**Statutes, Rules, and Regulations**

17 C.F.R. § 240 ................................................................4, 9, 10

5 U.S.C. § 553(c) ...............................................................5, 20

**Other Authorities**

Administrative Conference of the United States,
    Recommendation No. 2011-2 (June 16, 2011)................................24

Am. Council for Capital Formation, *Proxy Advisors Are Still a
    Problem* (Dec. 2021) ......................................................11

Am. Council for Capital Formation, *Are Proxy Advisors Still a
    Problem?* (July 2020).................................................12, 13

Chairman Gensler, *Statement on the Application of the Proxy
    Rules to Proxy Voting Advice* (June 1, 2021)................................16

Comment of the Bipartisan Policy Center, File No. S7-17-21
    (Dec. 27, 2021) .......................................................33, 34

Comment of the Business Roundtable, File No. S7-22-19 (Feb. 3,
    2020) ....................................................................11

Comment of the Business Roundtable, File No. S7-17-21 (Dec.
    23, 2021) ................................................................31

Comment of National Gas Services Group, Inc, File No. S7-17-21
    (Dec. 27, 2021) ..........................................................32

Comment of U.S. Chamber of Commerce, File No. S7-22-19 (Jan.
    31, 2020) .................................................................2

Comment of U.S. Chamber of Commerce, File No. S7-17-21
    (Nov. 30, 2021).......................................................19, 23

House Appropriations Committee, *Fiscal Year 2023 Budget
    Request for the Federal Trade Commission and the Securities
    and Exchange Commission* (May 18, 2022)................................23

Letter from Sen. Pat Toomey & Rep. Patrick McHenry to
Chairman Gary Gensler (Jan. 10, 2022) .........................................25

Matsuzaka & Shu, *Does Proxy Advice Allow Funds to Cast
Informed Votes?* (Oct. 25, 2022) .....................................................9

Memorandum to File from Sirimal R. Mukerjee, No. S7-24-16
(June 11, 2021)...............................................................................18

*Memorandum for the Heads of Executive Departments and
Agencies*, 86 Fed. Reg. 7223 (Jan. 20, 2021) .................................24

*NAM Manufacturers' Outlook Survey*, Fourth Quarter 2018
(Dec. 20, 2018) ...............................................................................13

Release No. 34-86721, *Commission Interpretation and
Guidance,* 84 Fed. Reg. 47,416 (Sept. 10, 2019).............................14

SEC, Press Release, *SEC Extends Comment Period for
Proposed Rules on Climate-Related Disclosures, Reopens
Comment Periods for Proposed Rules Regarding Private
Fund Advisers and Regulation ATS* (May 9, 2022)........................22

*Statement on Compliance with the Commission's 2019
Interpretation and Guidance* (June 1, 2021) .................................17

*Substantial Implementation, Duplication, and Resubmission of
Shareholder Proposals Under Exchange Act Rule 14a-8*, 87
Fed. Reg. 45,052 (July 27, 2022)....................................................35

Tao Li, *Outsourcing Corporate Governance: Conflicts of Interest
Within the Proxy Advisory Industry* (Aug. 24, 2016) .....................13

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that, in addition to the persons and entities identified in the Appellants' Certificate, the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 of the Rules of this Court have an interest in the outcome of this case. These representations are made so that the judges of this court may evaluate possible disqualification or recusal.

### Amici Curiae

1.   The Chamber of Commerce of the United States of America has no parent corporations, and no publicly held company has any ownership interest therein.

2.   The Business Roundtable has no parent corporations, and no publicly held company has any ownership interest therein.

### Counsel for Amici Curiae

Jeffrey B. Wall
Elizabeth A. Rose
Leslie B. Arffa
Stephanie M. Kelly
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C.  20006

Matthew A. Schwartz
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, N.Y.  10004

Jordan L. Von Bokern
Tyler S. Badgley
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, D.C. 20062


/s/ Jeffrey B. Wall

Jeffrey B. Wall
Counsel for Amici Curiae
January 13, 2023

## STATEMENT OF IDENTITY

The Chamber of Commerce of the United States of America (Chamber) is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country.

Business Roundtable (BRT) is an organization whose members lead America's largest companies, employing over 20 million workers. Their companies' total value, over $20 trillion, accounts for half of the value of all publicly traded companies in the United States. They spend and invest over $7 trillion a year, helping sustain and grow tens of thousands of communities and millions of medium and small-sized businesses.

An important function of the Chamber and BRT is to represent the interests of their members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber and BRT regularly file amicus curiae briefs in cases, like this one, that raise issues of concern to the nation's business community.

The Chamber and BRT have a particular interest in this appeal because many of their members are registrants with the Securities and Exchange

Commission, have publicly traded shares, are covered by proxy voting advice businesses (PVABs), and are adversely affected by the agency rulemaking at issue in this litigation. PVABs have on numerous occasions rendered materially inaccurate information about the Chamber's and BRT's member companies, forcing those companies to file expensive and time-consuming supplemental proxy statements that are not even guaranteed to reach shareholders prior to the vote in question.

Because of the issues the Chamber, BRT, and their members have identified with PVAB recommendations, the organizations devoted considerable time and energy to supporting the reasonable reforms to the PVAB industry required by the Commission's 2020 rulemaking and opposing the 2022 rulemaking at issue in this litigation due to its rescission of those same key reforms. *See* <u>ROA.349</u> (Comment of U.S. Chamber of Commerce, File No. S7-17-21 (Dec. 23, 2021) (Chamber Comment)); Comment of U.S. Chamber of Commerce, File No. S7-22-19 (Jan. 31, 2020), https://www.sec.gov/comments/s7-22-19/s72219-6730872-207435.pdf. They are also currently litigating a challenge to the same rulemaking at issue here. *Chamber of Commerce, et al.* v. *SEC*, No. 22-cv-561 (M.D. Tenn.).

## INTRODUCTION

This appeal concerns a hasty, politically motivated rulemaking that violated the procedural and substantive requirements of the Administrative Procedure Act (APA).  In 2020, the Securities and Exchange Commission promulgated the Proxy Voting Advice Rule, which was the result of a careful regulatory process involving significant public input over the course of 10 years.  *See generally* ROA.177-250 (*Exemptions from the Proxy Rules for Proxy Voting Advice*, 85 Fed. Reg. 55,082 (Sept. 3, 2020) (2020 Rule)).  The 2020 Rule included modest, compromise reforms aimed at bringing fairness and transparency to PVABs.  PVABs are the single most influential actors in the exercise of shareholders' voting power.  They provide recommendations to their clients on issues up for vote at thousands of shareholder meetings each year.

While almost every single actor engaged in proxy solicitations—*i.e.*, written communications explaining or advocating for positions on issues to be voted on at a shareholder meeting—is subject to stringent federal proxy rules, PVABs had been exempt from those rules.  17 C.F.R. § 240.14a-6.  There was abundant evidence before the Commission in 2020 (including evidence provided by the Chamber, BRT, and their members) that PVABs were basing

their recommendations on inaccurate information, without any opportunity for the subject companies to correct the record before shareholders voted. The 2020 Rule therefore made two simple reforms: PVABs had to provide their recommendations to subject companies and clients at the same time, and then alert their clients to any written response by the companies.

After a change in presidential administration, however, the Commission abruptly reversed course. In contrast to the fulsome process that led to the 2020 Rule, the Commission had a closed-door meeting with the opponents of the 2020 Rule, and then rushed through a rulemaking that did not allow a meaningful opportunity for public comment. Fewer than two years after promulgating the 2020 Rule, the Commission issued a final rule by a divided 3-2 vote in which it reversed the key reforms of the 2020 Rule without relying on any new data or changed circumstances. *See generally* ROA.124-54 (*Proxy Voting Advice*, 87 Fed. Reg. 43,168 (July 19, 2022) (2022 Rescission)). Instead, the Commission relied on the same underlying data but concluded that there no longer was any danger or downside to leaving PVABs to regulate themselves.

Appellants National Association of Manufacturers and National Gas Services Group challenged the 2022 Rescission as a violation of the APA's

procedural and substantive protections.  As they explain in their opening brief, the district court erred in granting the Commission's motion for summary judgment for several reasons.  NAM Br. 24-56.  The Chamber and BRT focus here on only a few of those reasons, which directly relate to their own experience and that of their members with PVABs and the challenged rulemaking.

First, the district court incorrectly concluded that the 2022 Rescission's truncated 30-day comment period satisfied the procedural requirements of the APA.  ROA.1029-30 (Mem. Op. 13-14).  The APA and this Court's cases require courts to assess whether commenters had a meaningful opportunity to comment on a particular proposed rule taking into account all available context.  *See* 5 U.S.C. § 553(c) (requiring that agencies "give interested persons an opportunity to participate in the rulemaking"); *see also Texas* v. *United States*, 809 F.3d 134, 170 (5th Cir. 2015) ("[T]he notice-and-comment process . . . 'is designed to ensure that affected parties have an opportunity to participate in and influence agency decision making.'") (quoting *U.S. Steel Corp.* v. *EPA*, 595 F.2d 207, 214 (5th Cir. 1979)).

As the Chamber, BRT, and their members experienced firsthand in this case, a number of factors rendered the 30-day comment period inadequate:  it

was half the length of the comment period for the 2020 Rule, violated the Commission's own policy of providing at least 60 days for comment, contravened well-established practice of prior presidential administrations and the Administrative Conference of the United States, fell over year-end holidays and fiscal reporting deadlines, and ignored requests from interested parties (including the Chamber) for a reasonable extension. In other words, rather than keeping an "open-minded attitude" as the APA requires, *N. Carolina Growers' Ass'n* v. *United Farm Workers*, 702 F.3d 755, 763 (4th Cir. 2012), the Commission rushed toward a predetermined outcome and excluded interested parties from meaningful participation in the rulemaking. On that procedural ground alone, the 2022 Rescission should be set aside.

Second, the district court erred in holding that the Commission adequately explained its reasons for the 2022 Rescission and thus satisfied the APA's substantive requirements. ROA.1027-29 (Mem. Op. 11-13). The APA protects against regulatory whiplash by "requir[ing] agencies to engage in 'reasoned decisionmaking.'" *Dep't of Homeland Sec.* v. *Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (quoting *Michigan* v. *EPA*, 576 U.S. 743, 750 (2015)). Here, the Commission simply embraced the conclusory assertions of PVABs about the supposed impact of the 2020 Rule on the costs, timeliness,

and independence of their recommendations. The Commission had rejected those same concerns two years prior and gave no justification for adopting them this time around. The Commission then compounded its error by ignoring the ample record evidence that rescinding the 2020 Rule's key reforms would stifle the dialogue among participants in the proxy-voting process to the detriment of shareholders and public companies. All told, the district court's analysis failed to seriously grapple with the deficiencies in the 2022 rulemaking.

## BACKGROUND

### A.    PVABs Exercise Enormous Influence Over Corporate Decisionmaking.

In the United States, the shareholders of publicly traded companies participate in critical corporate governance decisions through voting their shares. This voting power has largely come to be exercised "by proxy"—that is, through proxy-card ballots cast on behalf of shareholders, rather than votes cast in person at a shareholder meeting. ROA.252-53 (*Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice Release*, 84 Fed. Reg. 66,518, 66,518-19 (Dec. 4, 2019) (Proposed 2020 Rule)). Moreover, around three-quarters of shares are now owned by large institutional investors, such as mutual or pension funds. ROA.253 (Proposed 2020 Rule at 66,519). Those

institutional investors vote on thousands of proposals relating to public companies each year, with most of that voting occurring during a period of a few months known as proxy season. ROA.178 (2020 Rule at 55,083).

Without the time and personnel to thoroughly analyze each proxy voting decision, institutional investors have turned to PVABs for recommendations as to how to vote their shares. This business of providing proxy advice to institutional investors is dominated by Institutional Shareholder Services (ISS) and Glass Lewis, which together control over 90% of the market. ROA.222 (2020 Rule at 55,127 n.517). To further streamline the voting process, many institutional investors use so-called "robo-voting" procedures, whereby PVABs automatically submit those investors' votes in line with the PVAB's own recommendations without any review by the investors. ROA.178 (2020 Rule at 55,083).

For those reasons, in the Commission's own words, PVABs now "play a critical role in the proxy voting process." ROA.721 (SEC Opp. at 4). Given the "critical" role that PVABs play, it is no exaggeration to say that "the effectiveness of shareholder democracy hinges on the quality of proxy advice." Matsuzaka & Shu, *Does Proxy Advice Allow Funds to Cast Informed Votes?*

27                    (Oct.                    25,                    2022),

https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3866041.

### B.    PVAB Advice Contains Notable Deficiencies.

Despite their extraordinary and undisputed influence on corporate governance, for much of their existence, PVABs enjoyed a unique freedom from regulatory oversight.  As mentioned, all other actors engaged in proxy solicitations are subject to stringent federal proxy rules.  17 C.F.R. § 240.14a-6. Under those rules, anyone making proxy solicitations must disclose specific information in a "definitive proxy statement" filed with the Commission that may not be materially false or misleading.  17 C.F.R. § 240.14a-9.  Yet PVABs remained exempt from those requirements, and as their (unregulated) power continued to grow, several troubling issues emerged with respect to their practices that garnered attention from the public, the Commission, and a bipartisan group in Congress.

First, it became apparent that PVABs often operate under undisclosed conflicts of interest.  This occurs in a variety of circumstances, including when PVABs provide corporate-governance consulting services (for a fee) to some of the same companies about which they also provide proxy voting recommendations.  ROA.179 (2020 Rule at 55,096).  That conflict can force

companies to purchase the PVAB's consulting services or risk PVAB recommendations adverse to companies that do not purchase the services. These undisclosed conflicts are less visible to PVAB clients who, according to the Commission, "may not have sufficient information to reasonably understand and adequately assess these potential conflicts . . . when they evaluate the voting advice and make their voting determinations." ROA.179 (2020 Rule at 55,096).

Second, PVAB voting recommendations are often premised on inaccurate or incomplete information. For example, surveys of CEOs conducted by BRT in 2013 and 2018 revealed that *nearly every single respondent* had identified factual errors in PVAB recommendations. Comment of the Business Roundtable, File No. S7-22-19, 7 (Feb. 3, 2020), https://www.sec.gov/comments/s7-22-19/s72219-6742505-207780.pdf. And surveys conducted by the American Council for Capital Formation found that businesses were forced to file supplemental proxy materials to dispute or correct errors contained within PVAB reports on at least 42 occasions in 2020 and 50 occasions in 2021. Am. Council for Capital Formation, *Proxy Advisors Are Still a Problem* (Dec. 2021), perma.cc/C55R-39ZX. Those findings vastly understate the problem, because they only capture instances where companies

were able to file supplemental proxy materials *before* the shareholder vote, which is often impossible to do. Most PVAB recommendations are issued just days prior to the vote in question, and the use of automated voting processes such as robo-voting means companies are often unable to respond in time to factual errors in the recommendations. ROA.264 (Proposed 2020 Rule at 66,530).

Even in the rare case when a company has time to review PVAB recommendations and file supplemental proxy materials with the Commission responding to such errors, there is no mechanism for ensuring that shareholders are aware of, or have access to, those supplemental filings before casting their votes. ROA.254, 267 (Proposed 2020 Rule at 66,520, 66,533). PVABs are under no obligation to inform their clients of supplemental filings and they are generally unresponsive to corporate calls to do so, as amici's members have witnessed firsthand. ROA.254 (Proposed 2020 Rule at 66,520); ROA.477 (Comment of Exxon Mobil Corp., File No. S7-22-19, 25 (Feb. 3, 2020)) ("Our experience is that supplemental proxy materials filed with the SEC after the release of the proxy advisors' reports . . . are ineffective."). As a result, institutional investors continue to cast their proxy votes based on inaccurate or incomplete information.

The Chamber, BRT, and their members have been directly harmed by these deficiencies in PVABs' practices. For example, one business was subject to a PVAB voting recommendation based on a wildly incorrect net income figure for the company that was off by $1.7 billion. Am. Council for Capital Formation, *Are Proxy Advisors Still a Problem?* (July 2020) at 5, https://accf.org/wp-content/uploads/2020/07/ACCF-ProxyProblemReport-final.pdf. Chamber and BRT members reported other egregious mistakes, including PVAB recommendations that entirely misstated director qualifications, misread company disclosures, or ignored governing law. *Id.*

These concerns are not academic. In amici's experience, issues with conflicts of interest and inaccurate or misleading information create significant and detrimental real-world consequences for shareholder value. *See* Tao Li, *Outsourcing Corporate Governance: Conflicts of Interest Within the Proxy Advisory Industry* (Aug. 24, 2016) at 4, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2828690 (empirical study finding that "biased [PVAB] recommendations have real negative consequences"); *NAM Manufacturers' Outlook Survey*, Fourth Quarter 2018 (Dec. 20, 2018) at 8, 13, perma.cc/9CNE-HSYU (over half of public companies

surveyed reported diverting resources from their core business functions when attempting to respond and correct PVAB recommendations).

**C.    The Commission Embarked On A Decade-Long Effort To Craft Appropriate Regulations for PVABs, Culminating In The 2020 Rule.**

Against that backdrop, beginning in 2010, the Commission embarked on a decade-long review process that included numerous requests for comment and fact-finding discussions with members of the public.   Release No. 34-86721, *Commission Interpretation and Guidance*, 84 Fed. Reg. 47,416 (Sept. 10, 2019), https://www.sec.gov/rules/interp/2019/34-86721.pdf.   That careful, public process culminated in a Proposed Notice of Rulemaking that considered modest regulatory changes.   ROA.254 (Proposed 2020 Rule at 66,520).  The proposed "amendments to the federal proxy rules" reflected the Commission's "concern[] about the risk of [PVABs] providing inaccurate or incomplete voting advice . . . that could be relied upon to the detriment of investors."   ROA.254 (Proposed 2020 Rule at 66,520).   During the 60-day comment period that followed, 650 comments were submitted by members of the public, and the Commission staff engaged in 84 meetings with interested parties. *Comments on Proposed Rule:  Amendments to Exemptions from the*

*Proxy Rules for Proxy Voting Advice*, Release No. 34-8757; File No. S7-22-19, https://www.sec.gov/comments/s7-22-19/s72219.htm.

The 2020 Rule was issued on September 3, 2020, and reflected notable substantive revisions from the Proposed 2020 Rule in response to public comments and meetings. *See generally* ROA.177-250 (2020 Rule). It amended the Commission's proxy rules to clarify that the issuance of proxy voting advice by PVABs constitutes a solicitation under the securities laws. Accordingly, like all other actors who disseminate information in the proxy voting process, PVABs would be subject to the proxy rules. ROA.179 (2020 Rule at 55,084).

The 2020 Rule also created several conditions that, if met, would exempt PVABs from the proxy rules' requirements. First, PVABs were required to disclose any potential conflicts of interests. ROA.249 (2020 Rule at 55,154). Second, PVABs were required to (i) adopt policies designed to reasonably ensure that "[r]egistrants that are the subject of the proxy voting advice have such advice made available to them at or prior to the time when such advice is disseminated to the [PVAB's] clients" and (ii) "provide[] [their] clients with a mechanism by which they can reasonably be expected to become aware of any written statements regarding its proxy voting advice by registrants who are

the subject of such advice, in a timely manner." ROA.249 (2020 Rule at 55,154) (Issuer-Engagement Conditions). The 2020 Rule further made clear that PVABs are subject to the antifraud provisions that govern proxy solicitations by adding an explanatory note to the antifraud regulations. Note (e) announced that the "[f]ailure to disclose material information regarding proxy voting advice . . . such as the [PVAB's] methodology, sources of information, or conflicts of interest" may constitute a misstatement. ROA.250 (2020 Rule at 55,155).

### D. A New Majority On The Commission Illegally Refused to Enforce The 2020 Rule, And Then Promulgated The 2022 Rescission On An Artificially Truncated Timeline.

Just nine months after the 2020 Rule was issued—and six months before it would even go into effect—the Commission undertook coordinated, irregular, and unlawful actions to rescind the 2020 Rule.

First, on June 1, 2021, Chairman Gensler released a statement directing the staff to "consider whether to recommend that the Commission revisit" the 2020 Rule. Chairman Gensler, *Statement on the Application of the Proxy Rules to Proxy Voting Advice* (June 1, 2021), perma.cc/AZK5-6LND. Later that day, the Commission's Division of Corporation Finance declared in a statement that it would not recommend any enforcement action based on the

-15-

2020 Rule while the Commission considered "further regulatory action in this area." *Statement on Compliance with the Commission's 2019 Interpretation and Guidance* (June 1, 2021), perma.cc/GH2BYSJ4. And in a motion to hold in abeyance ISS's legal challenge to the 2020 Rule, the Commission confirmed that PVABs would no longer have to comply with the Rule's upcoming compliance deadline. *Institutional Shareholder Services Inc.* v. *SEC*, No. 19-cv-3275, Dkt. 53 at 4 (D.D.C. June 1, 2021). The district court would later find that this suspension of the 2020 Rule without providing for notice and comment violated the APA. *Nat'l Ass'n of Mfr.* v. *SEC*, No. 7:21-cv-183 (W.D. Tex. Sept. 28, 2022).

That was not the end of the procedural improprieties. Ten days later, on June 11, 2021, the Commission staff held a closed-door meeting with various representatives from large institutional investors and affiliated industry groups—all of whom had opposed the 2020 Rule. The Commission's only disclosure regarding the substance of this meeting was buried in a footnote to the 2021 Proposed Rescission indicating that the 21 attendees used the meeting to continue to express their opposition to the 2020 Rule. ROA.158-159 (*Proxy Voting Advice*, 86 Fed. Reg. 67,383, 67,385 n.24 (Nov. 26, 2021) (2021 Proposed Rescission)). Although the Commission prepared a two-page

memorandum identifying the meeting attendees and referencing a discussion of an entirely separate rule proposal, the Commission curiously omitted *any* mention of the 2020 Rule. *See* Memorandum to File from Sirimal R. Mukerjee, No. S7-24-16 (June 11, 2021), https://www.sec.gov/comments/s7-24-16/s72416-8906874-244205.pdf.    Seeking more information, the Chamber filed an expedited FOIA request regarding this meeting on February 1, 2022—almost a year ago—but has yet to receive any documents or information in response to its request.

Several months after that closed-door meeting, on November 26, 2021, the Commission issued a new proposed rule on proxy voting advice by a 3-2 party-line vote.  The proposed rule would rescind the 2020 Rule's Issuer-Engagement Conditions and would also delete Note (e).  ROA.158-59, 163 (2021 Proposed Rescission at 67,385-86, 67,390).

Reflecting the predetermined nature of the rulemaking, the 2021 Proposed Rescission was issued with a 30-day comment period—from November 27 to December 27, 2021—which overlapped with several year-end holidays and fiscal deadlines for many public companies.  The Chamber, among others, petitioned the Commission to extend the comment period, but the Commission ignored these requests and declined to provide any

justification for the needlessly accelerated comment period.  U.S. Chamber of Commerce, File No. S7-17-21 (Nov. 30, 2021), https://www.sec.gov/comments/s7-17-21/s71721-9414487-263137.pdf (Chamber Extension Request); *see also* ROA.406 (Letter of the American Securities Association (Dec. 3, 2021)).  Unsurprisingly, the Commission received just 61 comments during the rushed comment period—fewer than one-tenth of the 650 comments received in response to the Proposed 2020 Rule.

On July 13, 2022, the Commission approved the 2022 Rescission by another 3-2 party-line vote.  *See generally* ROA.124-154 (2022 Rescission). Unlike the 2020 Rule, which thoughtfully addressed and incorporated public feedback through significant revisions to the Proposed 2020 Rule, the substance and purported rationale of the 2022 Rescission remained unchanged from the 2021 Proposed Rescission.

## ARGUMENT

I.    **The District Court Erred In Concluding That The 30-Day Comment Period Did Not Deprive The Public Of A Meaningful Opportunity To Comment.**

At the outset, the Commission violated the APA in promulgating the 2022 Rescission because the abbreviated comment period did not "give

-18-

interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments." 5 U.S.C. § 553(c). The district court failed to address a number of reasons why stakeholders, including amici and their members, were not afforded a "meaningful opportunity" for comment as the APA requires. *Rural Cellular Ass'n* v. *FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009).

Although the district court correctly observed that both the Supreme Court and the Fifth Circuit have concluded "that a proposed action under the APA *generally requires a minimum* 30-day comment period," it incorrectly assumed that a 30-day comment period is presumptively lawful. ROA.1029-31 (Mem. Op. 13-15) (emphasis added). While "a 30-day comment period is generally the *shortest* time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment," *Nat'l Lifeline Ass'n* v. *Fed. Commc'ns Comm'n*, 921 F.3d 1102, 1117 (D.C. Cir. 2019) (emphasis added), numerous courts have found comment periods of 30 days, or even longer, were insufficient to allow meaningful comment on certain regulations. *See, e.g.*, *Cath. Legal Immigr. Network, Inc.* v. *Exec. Off. for Immigr. Rev.*, 2021 WL 3609986, at *3 (D.D.C. Apr. 4, 2021) (30-day comment period was inadequate and violated Executive Branch policy of providing 60

days for comment); *Est. of Smith* v. *Bowen*, <u>656 F. Supp. 1093, 1098-99</u> (D. Colo. 1987) (60-day comment period was insufficient).

In other words, the context of the proposed rule matters. That is so because the APA requires that the "opportunity for comment" be "a *meaningful* opportunity" to ensure that "the agency maintains a flexible and open-minded attitude towards its own rules." *N. Carolina Growers' Ass'n*, <u>702 F.3d at 763</u>; *see Coal. for Workforce Innovation* v. *Walsh*, <u>2022 WL 1073346</u>, at \*7-8 (E.D. Tex. Mar. 14, 2022) ("[C]ourts require that agencies provide a 'meaningful' opportunity for comment."). As this Court has explained, the very purpose of the APA's notice-and-comment requirement is to "assure fairness and mature consideration of rules having a substantial impact on those regulated" and to "allow[] the agency to educate itself before adopting a final order." *United States* v. *Johnson*, <u>632 F.3d 912, 931</u> (5th Cir. 2011) (internal quotation omitted).

The Commission did not exhibit "mature consideration," but rather a march toward a predetermined outcome. Indeed, the shortened period was further compressed because it ran from November 27, 2021 to December 27, 2021—overlapping with numerous year-end holidays and coinciding with the year-end fiscal reporting deadlines for many public companies. *See Pangea*

*Leg. Servs.* v. *U.S. Dep't of Homeland Sec.*, 501 F. Supp. 3d 792, 820 (N.D. Cal. 2020) (30-day comment period that "spann[ed] the holidays" was inadequate). As the Chamber explained to the Commission when it requested an extension of the comment period, that timeframe left the Chamber unable to "collect and assess relevant data from the most recent proxy season"—precisely the kind of empirical data and analysis specifically solicited by the Commission. Chamber Extension Request at 3; *see id.* (the proposed rule "requests comment on an array of complex issues that cannot be properly addressed within 30 days"). Yet the Commission ignored the Chamber's extension request, despite granting similar requests in contemporaneous rulemakings. *See* SEC, Press Release, *SEC Extends Comment Period for Proposed Rules on Climate-Related Disclosures, Reopens Comment Periods for Proposed Rules Regarding Private Fund Advisers and Regulation ATS* (May 9, 2022), https://www.sec.gov/news/press-release/2022-82.

The district court also erred in failing to take into account a variety of other factors beyond the comment period's length and its overlap with holidays and reporting deadlines. For example, the district court failed to consider that the allotted 30 days was just *half* of the 60-day comment period for the 2020 Rule that enacted the Issuer-Engagement Conditions in the first

place.  *See Becerra* v. *U.S. Dep't of the Interior*, <u>381 F. Supp. 3d 1153, 1177</u> (N.D. Cal. 2019) (30-day comment period for the repeal of rule created following a 120-day comment period was inadequate); *N. Carolina Growers' Ass'n*, <u>702 F.3d at 770</u> (comment period discrepancies indicated lack of opportunity for comment).  And although the district court acknowledged in passing that the shortened period violated the Commission's own self-professed policy, in the words of Chairman Gensler, of always giving market participants "at least two months" to comment on rule proposals, it did not grapple with the implications of that fact.  <u>ROA.1031</u> (Mem. Op. 15); *see* House Appropriations Committee, *Fiscal Year 2023 Budget Request for the Federal Trade Commission and the Securities and Exchange Commission* (May 18, 2022) (statement of Chairman Gensler), perma.cc/UM6V-PUDR.  Similarly, the comment period contravened well-established practice of the Executive Branch and the Administrative Conference of the United States of providing "not less than 60 days" to comment.  *Memorandum for the Heads of Executive Departments and Agencies*, <u>86 Fed. Reg. 7223</u> (Jan. 20, 2021), https://www.govinfo.gov/content/pkg/FR-2021-01-26/pdf/2021-01866.pdf; Administrative Conference of the United States, Recommendation No. 2011-2 (June                            16,                            2011),

https://www.acus.gov/sites/default/files/documents/Recommendation-2011-2-Rulemaking-Comments.pdf. "[I]t is troubling that defendants failed to abide by these guidelines." *Cath. Leg.*, 2021 WL 3609986, at *3.

The insufficiency of the comment period is borne out by the fact that it resulted in the submission of dramatically fewer comments to the Commission. Only 61 comments were submitted on the proposed Rescission—just *one-tenth* of the 650 comments received in response to the Proposed 2020 Rule. *See Pangea*, 501 F. Supp. 3d at 820 ("insufficiency of the notice process" reflected in repeal receiving "far fewer comments"). Even the Commission acknowledged that this limited set of comments resulted in a less informed analysis, noting that it did "not receive[] information or data that would permit a quantitative analysis" of the impact of the 2022 Rescission despite having solicited that data. ROA.143 (2022 Rescission at 43,186). Nor did the Commission provide any explanation or justification for the brevity of the comment period, yet another factor that strongly suggests procedural inadequacy. *See Centro Legal de la Raza* v. *Exec. Off. for Immigr. Rev.*, 524 F. Supp. 3d 919, 955 (N.D. Cal. 2021); *Cath. Leg.*, 2021 WL 3609986, at *3.

Reflecting on the rulemaking, a dissenting Commissioner labeled the comment period "insufficient under the circumstances," ROA.313-15

(Commissioner Uyeda, Statement on Final Rule Amendments on Proxy Voting Advice (July 13, 2022)), while members of Congress observed that the "unreasonably short comment period" may have "run afoul of the [APA]," Letter from Sen. Pat Toomey & Rep. Patrick McHenry to Chairman Gary Gensler (Jan. 10, 2022) at 1, 2 n.4, http://republicans-financialservices.house.gov/uploadedfiles/2022-01-10_pmc_toomey_letter-gensler_sec_comment_period.pdf.

The Chamber and BRT concur with that assessment, and indeed many of their members were unable to comment on the 2022 Rescission because of the truncated timeframe. For all of these reasons, the district court erred in concluding that the 2022 Rescission did not violate the APA's procedural requirements.

## II.    The District Court Erred In Concluding That The Commission Adequately Explained Its Change In Position.

The Supreme Court has made clear in recent years that the APA demands more of an agency when it is "chang[ing] course." *Regents*, 140 S. Ct. at 1913. In particular, an agency must provide a "more detailed justification" for a rule change when "its new policy rests upon factual findings that contradict those which underlay its prior policy." *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The district court reasoned that

because the record before the agency remained unchanged, the agency could not have made any *new* factual findings.  ROA.1022-23 (Mem. Op. 6-7).  But as Appellants explain, the 2022 Rescission directly contradicts the two factual findings that underpinned the 2020 Rule, even though there were no new data or changed circumstances in the record to justify those contradictions.  Because the 2022 Rescission contradicts factual findings underlying the 2020 Rule, *Fox*'s heightened standard should apply.  *See* NAM Br. 24-34.  The Commission does not argue that it met that standard here, and the district court erred in failing to hold them to it.

Even if the SEC had been writing on an entirely blank slate, it still had to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The 2020 Rule reflected the Commission's reasoned determination that modest regulation of PVABs was warranted to facilitate more transparent and accurate information for shareholders to make their proxy voting decisions.  In reaching the opposite conclusion just two years later, the Commission never explained why the *same* data and circumstances that supported the 2020 Rule—many of which amici and their members had brought to the

Commission's attention through their comments—could be almost immediately ignored.  Instead, the Commission offered up a conclusory analysis that "r[an] counter to the evidence before the agency." *Nat'l Ass'n of Home Builders* v. *Defs. of Wildlife*, 551 U.S. 644, 658 (2007).  The district court erred in ignoring these deficiencies and condoning the Commission's *post-hoc* justifications for the 2022 Rescission.

### A.    The Commission's Conclusory Justifications For The 2022 Rescission Are Insufficient.

In holding that the Commission had provided a sufficient explanation for the 2022 Rescission, the district court primarily relied on the Commission's assertion that the Issuer-Engagement Conditions would negatively influence the "timeliness and independence" of PVAB advice.  ROA.1027 (Mem. Op. 11). But these *exact* concerns were raised and addressed during the 2020 rulemaking process.  Specifically, the Commission removed the requirement that PVABs give companies an advance review of their advice in *draft* form, opting instead to require PVABs only to provide their *final* advice to companies at the same time as they provide it to their clients.  ROA.345 (Chamber Comment at 6 (explaining that in response to comments the Commission "decided on a lighter regulatory touch that gives flexibility to PVABs")).  With this change, the Commission made the factual finding that

"the [2020] rule does not create the risk that [PVAB] advice would be delayed or that the independence thereof would be tainted as a result of a registrant's pre-dissemination involvement."  ROA.207 (2020 Rule at 55,112).

Critically, in the 2022 rulemaking, the Commission did not point to any evidence or changed circumstances to justify why concerns raised two years ago were suddenly no longer substantial or persuasive.  *Organized Vill. of Kake* v. *USDA*, 795 F.3d 956, 967 (9th Cir. 2015) (failure to explain change in position within a two-year period rendered rule arbitrary and capricious).  Indeed, the 2022 Rescission never explained *why* the Issuer-Engagement Conditions would supposedly detract from the speed or independence of PVAB advice.

The Commission pointed below to the fact that the 2022 Rescission recites concerns from commenters that the Issuer-Engagement Conditions would disrupt "the preparation and delivery of proxy voting advice" and compromise "investors' confidence in the integrity of such advice."  ROA.728-29 (SEC Opp. 11-12).  Although an agency is generally free to "incorporate" reasoning from comments, the Commission did not actually do that in the 2022 Rescission.  Only in this litigation has the Commission relied on those comments as a "post hoc rationalization," which "cannot serve as a sufficient

predicate for agency action." *Regents*, <u>140 S. Ct. at 1909</u> (quoting *Am. Textile Mfrs. Inst., Inc.* v. *Donovan*, <u>452 U.S. 490, 539</u> (1981)).

Moreover, even if the Commission had credited certain comments, it failed to satisfy its obligation to provide an explanation as to why it "chose to rely on certain comments rather than others." *AARP* v. *U.S. Equal Emp't Opportunity Comm'n*, <u>267 F. Supp. 3d 14, 32</u> (D.D.C. 2017). The Commission's embrace of vague and unsubstantiated concerns offered by interested parties did not meet its statutory obligations under the APA. *Susquehanna Int'l Grp.* v. *SEC*, <u>866 F.3d 442, 447</u> (D.C. Cir. 2017); *Greene Cnty. Planning Bd.* v. *Fed. Power Comm'n*, <u>455 F.2d 412, 420-22</u> (2d Cir. 1972) (invalidating action where agency "substituted the statement of [the regulated entity] for its own" due to "potential, if not likelihood, that the [regulated entity's] statements will be based on self-serving assumptions").

The district court also uncritically accepted the Commission's attempt to justify the 2022 Rescission on the basis that it "alleviated" the "financial burden[s]" imposed by the 2020 Rule. <u>ROA.1026</u> (Mem. Op. 10). But just as it never explained *why* the 2020 Rule would harm the independence or timeliness of PVAB advice, the Commission never explained *why* the Issuer-Engagement Conditions in the 2020 Rule would meaningfully increase costs.

That conclusion is particularly baffling given the Commission's other finding that PVABs' "voluntary practices" could substitute for the Issuer-Engagement Conditions. ROA.145, 153 (2022 Rescission at 43,188, 43,196). If it were true that PVABs were already voluntarily providing notice to companies and clients, then the costs of requiring such notice under the 2020 Rule would be quite small.

In fact, the Commission's contradiction of its prior factual findings about PVABs' voluntary efforts "ran counter to the evidence before the agency." *Nat'l Ass'n of Home Builders*, 551 U.S. at 658. The Commission had already considered industry self-regulation in promulgating the 2020 Rule and concluded that "we do not believe the existing voluntary forms of outreach to registrants and other market participants . . . are alone sufficient." ROA.203 (2020 Rule at 55,108). And as BRT explained and the Commission acknowledged, the largest PVAB, ISS, had changed its policies in January 2021 in a way that *reduced* engagement with issuers by eliminating any opportunity for companies to provide feedback on ISS's draft voting recommendations. ROA.161 (2021 Proposed Rescission at 67,388 n.59); Comment of the Business Roundtable, File No. S7-17-21 (Dec. 23, 2021) at 4, https://www.sec.gov/comments/s7-17-21/s71721-20110744-264609.pdf. The

Commission simply declined to address comments from amici and their members expressing frustration with voluntary engagement services. ROA.320 (Comment of Nasdaq, Inc., File No. S7-17-21 (Dec. 27, 2021) at 4).

### B.     The Commission Ignored The Costs On Public Companies Of Rolling Back The 2020 Rule.

The Commission also significantly understated the costs imposed on companies and investors by reversing the key provisions of the 2020 Rule. Ample record evidence, including that provided by amici and their members, indicated that PVABs' recommendations on corporate governance decisions sometimes contain inaccurate or incomplete information. *See, e.g.*, ROA.343 (Chamber Comment at 5); Comment of National Gas Services Group, Inc., File No. S7-17-21 (Dec. 27, 2021) at 4, https://www.sec.gov/comments/s7-17-21/s71721-20110790-264632.pdf.   When companies cannot address these deficiencies (or ensure that such corrections reach shareholders) prior to the shareholder vote, this undoubtedly diminishes shareholder value.  ROA.130 (2022 Rescission at 43,173); *see* ROA.367 (Chamber Comment, Attachment (citing Center for Market Competitiveness study explaining that "if the proxy advisors' recommendations are inappropriate, these changes can lead to a decrease in shareholder value")).

Nonetheless, in issuing the 2022 Rescission, the Commission first downplayed the PVAB errors demonstrated by the record. It characterized companies' need to make supplemental filings with the SEC correcting PVAB mistakes as evidence that "registrants were able to identify those issues and respond using pre-existing mechanisms." ROA.133 (2022 Rescission at 43,176). That pie-in-the-sky approach ignored that supplemental filings are not guaranteed to reach shareholders prior to a vote (particularly in light of robo-voting), and that subject companies often fail to identify errors in time to file them. *See, e.g.*, ROA.343 (Chamber Comment at 5). To make matters worse, after acknowledging that the PVAB industry is a duopoly, the Commission asserted that "market . . . competitiveness" would reduce the incidence of errors in PVAB voting advice. ROA.144 (2022 Rescission at 43,187); *see* ROA.308 (Commissioner Hester M. Peirce, *U-Turn: Comments on Proxy Voting Advice* (July 13, 2022) (highlighting commenters concerns that "[g]iven the concentration in the proxy voting advice market, proxy advisors have limited incentives to engage with public companies . . . to correct errors")). At a minimum, the Commission had to assume that there would be *some* error rate in PVAB recommendations that would impose *some* costs. As one commenter noted, "when tens of thousands of proposals are voted on every

year, even a small percentage of errors could have profound effect on the information that is used to cast those votes." Comment of the Bipartisan Policy Center, File No. S7-17-21 (Dec. 27, 2021) at 5-6, https://www.sec.gov/comments/s7-17-21/s71721-20111188-264840.pdf.

The Commission also ignored the costs of reduced engagement between registrants and issuers regardless of the rate of error. ROA.202 (2020 Rule at 55,107) ("Regardless of the incidence of errors in proxy voting advice, we believe it is appropriate to adopt reasonable measures designed to promote the reliability and completeness of information available to investors."). As explained above, PVABs' advice can be motivated by other goals, and can be premised on misunderstandings or apparent conflicts of interest. It follows that if companies do not have a meaningful opportunity to issue responses to PVAB recommendations—which can contain not only objective errors but also misleading analysis—costs to shareholders will follow. *See Business Roundtable* v. *SEC*, 647 F.3d 1144, 1152 (D.C. Cir. 2011) (finding that "investors with a special interest . . . can be expected to pursue self-interested objectives rather than the goal of maximizing shareholder value, and will likely cause companies to incur costs," and that the Commission "acted arbitrarily" when it "duck[ed] serious evaluation of th[ose] costs").

The Commission has recognized and explicitly factored into its rulemaking on other subjects the significant costs of even considering shareholder proposals that are not value-enhancing. *Substantial Implementation, Duplication, and Resubmission of Shareholder Proposals Under Exchange Act Rule 14a-8*, 87 Fed. Reg. 45,052 (July 27, 2022). The Commission's acknowledgement that PVABs can operate under apparent conflicts of interest without taking into account the costs of reduced dialogue among PVABs and issuer-companies further weakens the validity of its analysis. ROA.145 (2022 Rescission at 43,188).

## III.    The District Court Also Erred In Failing To Set Aside Note (e).

Separately, the district court erred by accepting the Commission's contention that the deletion of Note (e) was not final agency action and thus not subject to judicial review. The district court reasoned that Note (e) was "explanatory" and therefore did not create "rights or obligations . . . from which legal consequences will flow," the hallmark of final action. ROA.1033 (Mem. Opp. 17). An "explanation" can create legal consequences, however, when it identifies bases for legal liability—such as Note (e)'s description of specific grounds for holding PVABs liable under federal securities laws. ROA.125 (2022 Rescission at 43,168) ("Failure to disclose material information

regarding proxy voting advice . . . such as the [PVAB's] methodology, sources of information, or conflicts of interest" may constitute a misstatement.). And even if Note (e) in isolation were not final agency action, it is not severable from the remainder of the unlawful rule—a point the district court declined to address. When a court "invalidate[s] a specific aspect of an agency's action, [it] leave[s] related components of the agency's action standing only if [it] can say without any substantial doubt that the agency would have adopted the severed portion on its own." *ACA Int'l* v. *Fed. Comm'n*, 885 F.3d 687, 708 (D.C. Cir. 2018) (internal quotation omitted). Because there is substantial doubt that the Commission would have taken either action independently, Note (e) is non-severable and the Commission's rescission of it through the 2022 Rescission should be set aside.

## CONCLUSION

For these reasons and those set forth in Appellants' brief, this Court should reverse the judgment below and set aside the 2022 Rescission.

Dated:   Washington, D.C.
         January 13, 2023

Respectfully submitted,

Jordan L. Von Bokern
Tyler S. Badgley
U.S. CHAMBER LITIGATION CENTER
1615 H Street, N.W.
Washington, D.C.  20062
(202) 463-5337

/s/ Jeffrey B. Wall
Jeffrey B. Wall
Elizabeth A. Rose
Leslie B. Arffa
Stephanie M. Kelly
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C.  20006
(202) 956-7500

Matthew A. Schwartz
SULLIVAN & CROMWELL LLP

125 Broad Street
New York, New York  10004
(212) 558-4000

*Counsel for Amici Curiae the
Chamber of Commerce of the United
States of America and Business
Roundtable*

-35-

## CERTIFICATE OF COMPLIANCE

Pursuant to <u>Federal Rule of Appellate Procedure 32(g)(1)</u>, I certify that:

This brief complies with the length limitation of <u>Federal Rule of Appellate Procedure 29(a)(5)</u> and Circuit Rule 29.3 because this brief contains 6253 words, excluding the parts of the brief exempted by <u>Federal Rule of Appellate Procedure 32(f)</u>.

This brief complies with the typeface requirements of <u>Federal Rule of Appellate Procedure 32(a)(5)</u> and the type style requirements of <u>Federal Rule of Appellate Procedure 32(a)(6)</u> because this brief has been prepared in a proportionately spaced typeface using Century Expanded 14-point font.

Dated:   Washington, D.C.
         January 13, 2023

/s/ Jeffrey B. Wall
Jeffrey B. Wall
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C. 20006
(202) 956-7500

*Counsel for Amici Curiae the Chamber of Commerce of the United States of America and Business Roundtable*

-36-

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2023 I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished through the CM/ECF system.

Date:  January 18, 2023

/s/ Jeffrey B. Wall
Jeffrey B. Wall
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C. 20006
(202) 956-7500

*Counsel for Amici Curiae the Chamber of Commerce of the United States of America and Business Roundtable*