No. 22-51069

# In the United States Court of Appeals for the Fifth Circuit

---

NATIONAL ASSOCIATION OF MANUFACTURERS
and NATURAL GAS SERVICES GROUP, INC.,
*Plaintiffs-Appellants,*

– v. –

UNITED STATES SECURITIES AND EXCHANGE COMMISSION and
GARY GENSLER, in his official capacity as Chair of the SEC,
*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Western District of Texas
Case No. 7:22-cv-163-DC
Hon. David Counts

---

**BRIEF OF *AMICI CURIAE* FORMER SEC OFFICIALS AND LAW
PROFESSORS IN SUPPORT OF PLAINTIFFS-APPELLANTS AND
REVERSAL**

---

VIRGINIA GRACE DAVIS
MUNGER, TOLLES & OLSON LLP
560 Mission Street
27th Floor
San Francisco, CA 94105
grace.davisfisher@mto.com
(415) 512-4083

DONALD B. VERRILLI, JR.
ELAINE J. GOLDENBERG
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, DC 20001
donald.verrilli@mto.com
elaine.goldenberg@mto.com
(202) 220-1100

*Counsel for Amici Curiae Former SEC Officials And Law Professors*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellants:** The National Association of Manufacturers ("NAM"), which is a 501(c)(6) non-profit organization, has no parent corporation, and of which no publicly held corporation owns 10% or more of its stock; and Natural Gas Services Group, Inc. ("NGS"), which is a publicly traded corporation that has no parent corporation, and of which no publicly held corporation owns 10% or more of its stock.

**Counsel for Plaintiffs-Appellants:** For all Plaintiffs-Appellants:  Paul W. Hughes; Debbie E. Green; Andrew A. Lyons-Berg; McDermott Will & Emery LLP.  For the National Association of Manufacturers:  Erica T. Klenicki; Michael A. Tilghman II.

**Defendants-Appellees:** The United States Securities and Exchange Commission and Gary Gensler, in his official capacity as Chair of the Securities and Exchange Commission.

**Counsel for Defendants-Appellees:** B. David Fraser; Daniel Matro; Keefe Bernstein; Tracey A. Hardin.

i

**Amici Curiae:** Joseph A. Grundfest; Tao Li; Harvey Pitt; Paul Rose; J.W. Verret; Andrew N. Vollmer; Christopher J. Walker.

**Counsel for Amici Curiae:** Donald B. Verrilli, Jr.; Elaine J. Goldenberg; Virginia Grace Davis.

Dated:  January 13, 2023

    */s/ Elaine J. Goldenberg*
Donald B. Verrilli, Jr.
Elaine J. Goldenberg
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Suite 500 E
Washington, DC 20001
Tel:  (202) 220-1100
Donald.Verrilli@mto.com
Elaine.Goldenberg@mto.com

Virginia Grace Davis
MUNGER, TOLLES & OLSON LLP
560 Mission Street
San Francisco, CA 94105
Tel: (415) 512-4000
Grace.DavisFisher@mto.com

*Counsel for Amici Curiae Former SEC Officials And Law Professors*

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING *AMICI CURIAE* .................................................... 1

SUMMARY OF ARGUMENT ........................................................... 3

ARGUMENT .................................................................................. 6

I.      The 2020 Rule Was the Product of a Decade of Extensive Bipartisan Study and Effort ............................................................................. 6

II.     In Contrast, the 2022 Rule Involved Almost No Opportunity for Public Comment and No New Information-Gathering .............................. 14

III.    The Commission Violated The APA ........................................................ 19

CONCLUSION ............................................................................... 28

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Ass'n of Nat'l Advertisers v. FTC*,
   617 F.2d 611 (D.C. Cir. 1979) ....................................................... 5, 26

*Clean Air Council v. Pruitt*,
   862 F.3d 1 (D.C. Cir. 2017) ............................................................... 20

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
   140 S. Ct. 1891 (2020) ...................................................................... 19

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ................................................................ 4, passim

*Michigan v. EPA*,
   576 U.S. 743 (2015) ......................................................................... 19

*N. Carolina Growers' Ass'n, Inc. v. United Farm Workers*,
   702 F.3d 755 (4th Cir. 2012) ............................................................ 27

*Pension Ben. Guar. Corp. v. LTV Corp.*,
   496 U.S. 633 (1990) ......................................................................... 26

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015) ...................................................................... 20, 26

*Rural Cellular Ass'n v. FCC*,
   588 F.3d 1095 (D.C. Cir. 2009) ........................................... 5, 6, 25, 27

*Texas v. Biden*,
   20 F.4th 928 (5th Cir. 2021) ............................................................. 23

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council,*
   *Inc.*,
   435 U.S. 519 (1978) ..................................................................... 5, 26

*Wages & White Lion Invs., L.L.C. v. FDA*,
   16 F.4th 1130 (5th Cir. 2021) ........................................................... 23

# TABLE OF AUTHORITIES
## (Continued)

**Page**

**FEDERAL STATUTES**

5 U.S.C. § 553(c) .................................................................. 5, 24, 27

**RULES - OTHER**

Federal Rule of Appellate Procedure 29(a) .............................................1

**FEDERAL REGULATIONS**

58 Fed. Reg. 51,735 (Sept. 30, 1993) ..................................................25

*Amendments to Exemptions from the Proxy Rules for Proxy Voting
Advice*, 84 Fed. Reg. 66,518 (Dec. 4, 2019) ....................................11

*Commission Interpretation and Guidance Regarding the Applicability
of the Proxy Rules to Proxy Voting Advice*, Release No. 34-86721,
84 Fed. Reg. 47,416 (Sept. 10, 2019) ...............................................10

Executive Order 13258, 67 Fed. Reg. 9385 (Feb. 26, 2002)..................25

Executive Order 13563, 76 Fed. Reg. 3821 (Jan. 18, 2011) .................25

*Exemptions from the Proxy Rules for Proxy Voting Advice*, 85 Fed.
Reg. 55,082 (Sept. 3, 2020).................................................... 7, passim

Memorandum for the Heads of Executive Departments and Agencies,
*Modernizing Regulatory Review*, 86 Fed. Reg. 7223 (Jan. 20,
2021) .................................................................................................25

*Proxy Voting Advice*, 87 Fed. Reg. 43,168 (July 19, 2022) ..................23

*Proxy Voting Advice*, Release No. 93595 (Nov. 6, 2021), 86 Fed. Reg.
67,383 ........................................................................................ 16, 21

**OTHER AUTHORITIES**

Administrative Conference of the United States, Rulemaking
Comments, Recommendation No. 2011-2 (June 16, 2011) .............25

*Black's Law Dictionary* (11th ed. 2019).............................................22

# TABLE OF AUTHORITIES
## (Continued)

**Page**

Chairman Jay Clayton, *Statement Announcing SEC Staff Roundtable on the Proxy Process* ..........................................................................9

*Comments on Concept Release on the U.S. Proxy System*, Release No. 34-62495, File No. S7-14-10 ....................................................7

*Comments on Proposed Rule:  Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice*, Release No. 34-87457; File No. S7-22-19 .........................................................................12

*Comments on Proposed Rule:  Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice*, Release No. 34-87457; File No. S7-22-19 .........................................................................12

*Comments on Proposed Rule:  Proxy Voting Advice*, Release No. 34-93595; File No. S7-17-21 .................................................17

*Comments on Proposed Rule:  Proxy Voting Advice*, Release No. 34-93595; File No. S7-17-21 .................................................18

*Comments on Proxy Advisory Firm Roundtable*, Release No. 34-70929, File No. 4-670 .................................................................8

*Comments on Statement Announcing SEC Staff Roundtable on the Proxy Process*, File No. 4-725 ...................................... 10, 11, 12

Concept Release on the U.S. Proxy System, Secs. Exch. Act Rel. No. 34-62495 (July 14, 2010) ..........................................................7

Gary Gensler, SEC Chairman, *Statement on the Application of the Proxy Rules to Proxy Voting Advice* (June 1, 2021) .........................15

House Appropriations Subcom. on Fin. Servs., *Hearing on the Fiscal Year 2023 SEC and Federal Trade Commission Budget Request* (May 18, 2022) ................................................................25

Letter from Senators William Hagerty and Tom Tillis to Chairman Gary Gensler (July 12, 2022) .................................................. 19, 25

# TABLE OF AUTHORITIES
## (Continued)

**Page**

Motion for Abeyance, *ISS Inc. v. SEC*, No. 19-cv-3275, Dkt. 53 (D.D.C. June 1, 2021) ......................................................................15

*NAM v. SEC*, No. MO:21-CV-183-DC (W.D. Tex., Sept. 28, 2022), Order Granting Mot. for Summary Judgment (Dkt. 47) ...............4, 20

*Opening Statement at the SEC Open Meeting* (July 14, 2010) ...............6

Paul Rose & Christopher J. Walker, Report for U.S. Chamber of Commerce, *Examining the SEC's Proxy Advisor Rule* 28 (Nov. 2020) ...........................................................................................19

*Proxy Advisory Services Roundtable*....................................................8

*SEC Announces Agenda, Panelists for Roundtable on Proxy Advisory Services* (Nov. 27, 2013)..................................................................7

*SEC Announces Agenda, Panelists for Staff Roundtable on the Proxy Process* (Nov. 8, 2018) ...................................................................10

SEC Division of Corporation Finance, *Statement on Compliance with the Commission's 2019 Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice and Amended Rule 14a-1(1), 14a-2(b), 14a-9* (June 1, 2021) ...............15

Staff Legal Bulletin 20, *Proxy Voting Responsibilities of Investment Advisers and Availability of Exemptions from the Proxy Rules for Proxy Advisory Firms* (June 30, 2014).............................................9

Statement of Commissioners Hester Peirce and Elad Roisman (June 1, 2021) .........................................................................................21

*Statement on Proxy Voting Advice Proposal* (July 13, 2022) ...............18

Steve Womack *et al.*, Letter to SEC on Proxy Advisory Firm Roundtable (Mar. 18, 2014)...............................................................8

*Transcript, Proxy Advisory Firms Roundtable* (Dec. 5, 2013) ...............8

*Transcript, Roundtable on the Proxy Process* (Nov. 15, 2018) ..............10

## STATEMENT REGARDING *AMICI CURIAE*[1]

*Amici curiae* are former senior officials of the Securities and Exchange Commission (the "Commission" or "SEC") and leading scholars. Most of the *amici* have been intimately involved in furthering the objectives of federal securities law for decades and have extensive experience regarding the Commission's regulatory functions, the proxy solicitation process, and regulation of proxy advisory firms. And all of the *amici* have assisted, either directly or through academic research and writings, the Commission's fidelity to its obligations under the Administrative Procedure Act (the "APA").

*Amici* are the following individuals[2]:

- **Joseph A. Grundfest** – Commissioner of the United States Securities and Exchange Commission (1985-1990); currently The William A. Franke Professor of Law and Business (emeritus), Stanford Law

---

[1] This brief is submitted under Federal Rule of Appellate Procedure 29(a) with the consent of all parties. *Amici* certify that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the preparation or submission of this brief; and no person other than *amici*, their members, and their counsel contributed money intended to fund this brief.

[2] The views of the *amici curiae* expressed here do not necessarily reflect the views of the institutions with which they are or have been affiliated. The names of institutions are included for identification only.

School, and Senior Faculty of the Rock Center on Corporate Governance at Stanford University

- **Tao Li** – Bank of America Assistant Professor of Finance, the University of Florida Warrington College of Business; former Assistant Professor of Finance, Warwick Business School; former consultant, L.E.K. Consulting; former consultant, Deutsche Bank

- **Harvey Pitt** – Chief Executive Officer of Kalorama Partners, LLC and Kalorama Legal Services, PLLC; twenty-sixth Chairman of the SEC; former General Counsel of the SEC; former senior corporate partner at Fried, Frank, Harris, Shriver & Jacobson LLP

- **Paul Rose** – Robert J. Watkins/Procter & Gamble Professor of Law and Director, Law, Finance & Governance at The Ohio State University Moritz College of Law; Senior Legal Consultant in the World Bank Group's Finance, Competitiveness, & Innovation Global Practice; former law clerk in the SEC Office of Mergers & Acquisitions, Division of Corporate Finance

- **J.W. Verret** – Associate Professor of Law, Antonin Scalia Law School at George Mason University; member of the SEC's Investor Advisory Committee; former Chief Economist and Senior Counsel to the U.S. House Committee on Financial Services

- **Andrew N. Vollmer** – Senior Affiliated Scholar, Mercatus Center at George Mason University; former Professor of Law, General Faculty, University of Virginia School of Law; former Deputy General Counsel of the SEC; former partner in the securities enforcement group of Wilmer Cutler Pickering Hale and Dorr LLP

- **Christopher J. Walker** – Professor of Law at the University of Michigan Law School; Senior Fellow, Administrative Conference of the United States; Chair, American Bar Association Section of Administrative Law & Regulatory Practice; former John W. Bricker Professor of Law at The Ohio State University Moritz College of Law

*Amici* include former SEC officials who worked at the agency in both Democratic and Republican administrations. Many of the *amici* participated in the SEC's rulemaking efforts that are the subject of this litigation.

The positions taken in this brief are those of the *amici* alone and should not be attributed to any institution with which the amici are or have been affiliated.

## SUMMARY OF ARGUMENT

After more than a decade of bipartisan effort that spanned multiple presidential administrations, the Commission issued a rule in September 2020 (the "2020 Rule") to address widespread concerns about the lack of accuracy and transparency in the U.S. proxy advisory system. The 2020 Rule, which required

proxy advisory firms to disclose conflicts of interest and to provide companies that are the subject of the proxy advisory firms' reports with an opportunity to comment on recommendations, was the product of numerous public meetings, hundreds of public comments, and extensive analysis by the agency.

Before the 2020 Rule took effect, however, a new majority of Commissioners abruptly changed course. In June 2021, the Commission indicated that it would not enforce the 2020 Rule. That refusal to enforce the 2020 Rule has now been ruled improper. *See NAM v. SEC*, No. MO:21-CV-183-DC (W.D. Tex., Sept. 28, 2022), Order Granting Mot. for Summary Judgment (Dkt. 47), *available at* https:// documents.nam.org/law/order_granting_nam_msj.pdf. The Commission then hastily issued a new rule that no longer required proxy advisory firms to show their advice to subject companies or to let their clients know if those companies identified any inaccuracies in that advice.

The Commission did not point to any changed circumstances to justify that radically different course of action—indeed, by definition it could not have done so, since the original rule was never allowed to take effect. And the district court's conclusion that the Commission's reversal was merely a "policy decision that weighed the same factual record differently," ROA.1023, ignores that the Commission made findings of fact that explicitly contradicted its previous findings without explanation—in direct violation of the APA, *see FCC v. Fox Television*

*Stations, Inc.*, 556 U.S. 502, 516 (2009) (when an agency departs from a prior policy, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy").

In addition, the procedures the Commission used in adopting the new rule were patently flawed. The agency based its policy reversal on little more than a closed meeting with opponents of the 2020 Rule and a truncated 30-day comment period that coincided with the year-end holiday season. The district court's refusal to inquire into the adequacy of the comment period was based on a misreading of the Supreme Court's *Vermont Yankee* doctrine, which "has no bearing on the power of courts to interpret and apply congressional directives," *Ass'n of Nat'l Advertisers v. FTC*, 617 F.2d 611, 619 n.10 (D.C. Cir. 1979), including the APA's requirement that agencies "give interested persons an opportunity to participate in the rule making" by permitting them sufficient time to weigh in on proposed agency actions, 5 U.S.C. § 553(c); *see Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009) (under the APA, the "opportunity for comment must be a meaningful opportunity").

In short, although administrative agencies have the right to take account of changed circumstances that affect the viability of a previously adopted rule, an agency that changes its position must provide a sufficient explanation for that change, and the agency must give the public a meaningful opportunity to comment

before executing the change. *See, e.g.*, *Fox*, 556 U.S. at 515; *Rural Cellular Ass'n*, 588 F.3d at 1101. The Commission failed to comply with those obligations when it replaced the 2020 Rule with a new rule ("the 2022 Rule"). Accordingly, *amici* respectfully submit that the Court should reverse the judgment of the district court with instructions to vacate the 2022 Rule.

## ARGUMENT

### I.    The 2020 Rule Was the Product of a Decade of Extensive Bipartisan Study and Effort

The 2020 Rule involved an extraordinary amount of study and consultation with the public, over the course of a full decade. That effort spanned the Obama and Trump administrations and involved extensive input from the proxy advisory firms, the companies to which those firms provide advice, and scores of other interested parties, including many of the *amici*. The most salient events of that period, culminating in the issuance of the 2020 Rule in September 2020, include:

1. *The 2010 Concept Release.* In July 2010, the Commission responded to widespread concerns regarding the U.S. proxy voting system by commencing its first "comprehensive review of the proxy voting infrastructure" in nearly three decades. Chairman Mary L. Schapiro, *Opening Statement at the SEC Open Meeting* (July 14, 2010), *available at* https://www.sec.gov/news/speech/2010/spch071410mls.htm. The Commission began by issuing a concept release that sought public comment on "whether the U.S. proxy system as a whole operates with the accuracy, reliability,

transparency, accountability, and integrity that shareholders and issuers should rightfully expect." Concept Release on the U.S. Proxy System, Secs. Exch. Act Rel. No. 34-62495 (July 14, 2010), *available at* https://www.sec.gov/rules/concept/2010/34-62495.pdf.

The concept release was an extensively researched 80-page document that analyzed a host of issues affecting the "accuracy, transparency, and efficiency" of the proxy voting process and requested public comment on over 40 questions bearing on those issues. *Id.* That release generated over 300 comments from individual investors, companies, industry associations, proxy advisory firms, and other members of the public. *See Comments on Concept Release on the U.S. Proxy System*, Release No. 34-62495, File No. S7-14-10, *available at* https://www.sec.gov/comments/s7-14-10/s71410.shtml. Commenters included Institutional Shareholder Services (ISS) and Glass Lewis, which together control over 90% of the proxy advisory market. *See Exemptions from the Proxy Rules for Proxy Voting Advice*, 85 Fed. Reg. 55,082, 55,127 n.517 (Sept. 3, 2020), *available at* https://www.sec.gov/rules/final/2020/34-89372.pdf.

2. *The 2013 Proxy Advisory Firm Roundtable*. In 2013, the Commission announced a roundtable, which included one of the *amici*, to discuss "issues identified in the Commission's 2010 concept release on the U.S. proxy voting system." *SEC Announces Agenda, Panelists for Roundtable on Proxy Advisory*

*Services* (Nov. 27, 2013), *available at* https://www.sec.gov/news/press-release/2013-253.[3]

In December 2013, all five Commissioners and seventeen additional panel members participated in a multi-hour in-person discussion. *See Proxy Advisory Services Roundtable*, *available at* https://www.sec.gov/spotlight/proxy-advisory-services.shtml; *Transcript*, *Proxy Advisory Firms Roundtable* (Dec. 5, 2013). "The Roundtable brought together a full spectrum of proxy voting participants— institutional investors, proxy advisers and issuers, as well as an expert from academia—for a thoughtful discussion of issues relating to proxy advisory services." Institutional Shareholder Services, Letter to SEC on Proxy Advisory Firm Roundtable (Mar. 5, 2014).

The roundtable also spurred over a dozen substantive, written public comments to the agency about issues surrounding the proxy voting system. Among the commenters were members of Congress, industry associations, and leading proxy advisory firms. *See Comments on Proxy Advisory Firm Roundtable*, Release No. 34-70929, File No. 4-670, *available at* https://www.sec.gov/comments/4-670/4-670.shtml; *see also, e.g.*, Steve Womack *et al.*, Letter to SEC on Proxy Advisory Firm Roundtable (Mar. 18, 2014) (letter from ten U.S. representatives expressing

---

[3] Former SEC Chairman and General Counsel Harvey Pitt was one of the participants.

"concerns with the conflicts of interest surrounding proxy advisory firms and the overreliance by market participants on these firms").

3.   *The 2014 Staff Legal Bulletin.*   In the wake of the roundtable, the Commission continued assessing proxy advisory issues.   In June 2014, the Commission's Divisions of Investment Management and Corporation Finance issued a Staff Legal Bulletin that provided guidance on investment advisers' proxy voting responsibilities and on the availability of, and requirements for, certain exemptions to the federal proxy rules on which proxy advisory firms had often relied.  Staff Legal Bulletin 20, *Proxy Voting Responsibilities of Investment Advisers and Availability of Exemptions from the Proxy Rules for Proxy Advisory Firms* (June 30, 2014), *available at* https://www.sec.gov/investment/slb20-proxy-voting-responsibilities-investment-advisers.

4. *The 2018 Roundtable.*  In July 2018, the Commission announced an "SEC Staff Roundtable on the Proxy Process" to discuss the information that had been gathered to date on proxy advisory issues and to assess the effects of "changes in our markets, technology, and how companies operate."   Chairman Jay Clayton, *Statement Announcing SEC Staff Roundtable on the Proxy Process*, *available at* https://www.sec.gov/news/public-statement/statement-announcing-sec-staff-roundtable-proxy-process.

The 2018 roundtable featured over 30 panelists, including professors, industry representatives, and the CEOs of Glass Lewis and ISS. *See SEC Announces Agenda, Panelists for Staff Roundtable on the Proxy Process* (Nov. 8, 2018), *available at* https://www.sec.gov/news/press-release/2018-260; *Transcript, Roundtable on the Proxy Process* (Nov. 15, 2018), *available at* https://www.sec.gov/files/proxy-round-table-transcript-111518.pdf. Key discussion topics at the day-long roundtable included ways to improve the "accuracy, transparency, and efficiency of the proxy voting and solicitation system" and "steps . . . regulators [should] consider to facilitate such improvements." *SEC Announces Agenda, Panelists for Staff Roundtable on the Proxy Process* (Nov. 8, 2018). In addition, the agency received 310 written comments from private individuals, businesses, and professors. *See Comments on Statement Announcing SEC Staff Roundtable on the Proxy Process*, File No. 4-725, *available at* https://www.sec.gov/comments/4-725/4-725.htm.

5. *The 2019 Guidance and Interpretation*. In September 2019, the Commission issued an "interpretation and related guidance regarding the applicability of the federal proxy rules to proxy voting advice provided by proxy advisory firms." *Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice*, Release No. 34-86721, 84 Fed. Reg. 47,416 (Sept. 10, 2019). In particular, the Commission noted that "proxy voting advice provided by a proxy advisory firm" generally "constitute[s] a

solicitation under the federal proxy rules." *Id.* at 47,417. It also confirmed that Exchange Act Rule 14a-9 "app[lies] to proxy voting advice." *Id.* at 47,419. The Commission noted that it had "carefully considered the feedback received" as a result of its public outreach efforts on issues related to the proxy process and stated that it was providing its interpretation and guidance "with the benefit of this extensive body of information, historical experience, and engagement." *Id.* at 47,416.

6. *The Proposed 2020 Rule.* Two months after providing the September 2019 guidance, the Commission issued a notice of proposed rulemaking concerning the amendment of its proxy solicitation rules to encompass the voting advice issued by proxy advisory firms. *See Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice,* 84 Fed. Reg. 66,518 (Dec. 4, 2019) (the "Proposed 2020 Rule"). The Commission noted that the proposal was "focused on the accuracy and soundness of the information and methodologies used to formulate proxy voting advice businesses' recommendations as well as potential conflicts of interest that may affect those recommendations." *Id.* at 66,520.

The Proposed 2020 Rule featured 80 pages of detailed analysis, including an extensive economic analysis. It requested public comments on that analysis and posed 63 specific questions for commenters to answer. *See* 84 Fed. Reg. at 66,518; *see also id.* at 66,540-553.

The Commission provided a 60-day period for public comment on the Proposed 2020 Rule and received extensive comments during that period. *See id.* at 66,518. All told, there were no fewer than 650 comments from industry leaders, individual and institutional investors, proxy advisory firms, and other interested parties. *See Comments on Proposed Rule: Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice*, Release No. 34-87457; File No. S7-22-19, *available at* https://www.sec.gov/comments/s7-22-19/s72219.htm.[4] In addition to considering those 650 comments, SEC officials participated in 84 separate meetings with members of the public regarding the Proposed 2020 Rule. *See Comments on Proposed Rule: Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice*, Release No. 34-87457; File No. S7-22-19, Meetings with SEC Officials (listing meetings with representatives of, *inter alia*, pension funds, industry associations, stock exchanges, and proxy advisory firms), *available at* https://www.sec.gov/comments/s7-22-19/s72219.htm.

---

[4] Two *amici* here were among the commenters who supported the Proposed 2020 Rule. *See* J.W. Verret, Letter to SEC on Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice (Jan. 22, 2020) (stating that the Proposed 2020 Rule was "in line with the SEC's primary mandate to protect the retail investors of the United States"); Tao Li, Letter to SEC on Amendments to Exemptions from the Proxy Rules for Proxy Voting Advice (Jan. 30, 2020) (noting that the Proposed 2020 Rule "makes positive strides" to address the "issue of conflicts of interest").

7. *The Final 2020 Rule.* After over a decade of research, analysis, and public dialogue, the Commission issued the final 2020 Rule in September 2020. *Exemptions from the Proxy Rules for Proxy Voting Advice*, 85 Fed. Reg. 55,082 (Sept. 3, 2020), *available at* https://www.sec.gov/rules/final/2020/34-89372.pdf. The 2020 Rule announced several modest reforms:

- The 2020 Rule amended Rule 14a-1(1) to codify the Commission's interpretation that proxy voting advice generally qualifies as a "solicitation" subject to the proxy rules. 85 Fed. Reg. at 55,091.

- The 2020 Rule provided that proxy advisory firms could avoid the federal proxy rules' disclosure and filing requirements if those firms (1) disclosed potential conflicts of interest; (2) provided companies about which they issued voting recommendations with access to the recommendations at the same time that the advisory firms' clients received the recommendations; and (3) notified their clients of the subject companies' responses. *See* 85 Fed. Reg. at 55,098-99, 55,108-109.

- The 2020 Rule confirmed that proxy advisory firms are subject to the anti-fraud regulations governing all proxy solicitations. It added Note (e) to Rule 14a-9, stating that the "failure to disclose material information regarding proxy voting advice . . . 'such as the [proxy

advisory firm's] methodology, sources of information, or conflicts of interest'" may constitute a misstatement under federal securities regulations. 85 Fed. Reg. at 55,121.

The 2020 Rule was a carefully tailored measure that differed from the Proposed 2020 Rule in several substantial ways. Those differences reflected the extensive comment that the agency received during the comment period from various interested parties. For example, although the Proposed 2020 Rule would have required proxy advisory firms to provide drafts of their voting recommendations to the subject companies *before* distributing that advice to the proxy advisory firms' clients, the 2020 Rule required only that proxy advisory firms make their voting advice available to subject companies and clients at the same time. *See* 85 Fed. Reg at 55,117. In addition, although the Proposed 2020 Rule would have required proxy advisory firms to include the company's written response to the proxy advisory firm's recommendations alongside those recommendations, the 2020 Rule merely required that proxy advisory firms alert their clients to any written response from the company in a timely manner before the relevant shareholder vote. *Id.*

## II.   In Contrast, the 2022 Rule Involved Almost No Opportunity for Public Comment and No New Information-Gathering

Despite a decade of effort and widespread public support, the 2020 Rule never took effect. In June 2021—six months before the 2020 Rule's effective date, *see* 85

Fed. Reg. at 55,122—a new Commission majority effectively rescinded the rule and replaced it with a new one.  *See* Gary Gensler, SEC Chairman, *Statement on the Application of the Proxy Rules to Proxy Voting Advice* (June 1, 2021), *available at* https://www.sec.gov/news/public-statement/gensler-proxy-2021-06-01;     SEC Division of Corporation Finance, *Statement on Compliance with the Commission's 2019 Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice and Amended Rule 14a-1(1), 14a-2(b), 14a-9* (June 1, 2021) (stating that the Division would "not recommend enforcement action to the Commission based on . . . the [2020 Rule] during the period in which the Commission [was] considering further regulatory action in this area"), *available at* https://www.sec.gov/news/public-statement/corp-fin-proxy-rules-2021-06-01; Motion for Abeyance, *ISS Inc. v. SEC*, No. 19-cv-3275, Dkt. 53 at 4 (D.D.C. June 1, 2021).

Shortly thereafter, the Commission's staff held a closed-door meeting solely with groups that had opposed the 2020 Rule.  The Commission has never disclosed what occurred at that meeting, later stating only that "Chair Gensler and members of the Commission staff met with representatives from" twenty-one groups that "expressed general opposition" to the 2020 Rule based on perceived "concerns about the costs associated with the 2020 Final Rules . . . and the general lack of

corresponding investor protection-based benefits." *Proxy Voting Advice*, Release No. 93595 (Nov. 6, 2021), 86 Fed. Reg. 67,383, 67,385 n.24.

In November 2021, the Commission issued a new proposed rule (the "Proposed 2022 Rule") that eradicated several key reforms established in the 2020 Rule. *See* 86 Fed. Reg. at 67,384-385. That proposed rule effectively rescinded the 2020 Rule's requirements that proxy advisory firms make their voting recommendations available to the companies that are the subject of those recommendations when they send those recommendations to clients and that those firms provide a means of informing their clients of the companies' responses. *See id.* It also removed Note (e) to Rule 14a-9, which clarified that failing to make certain disclosures in proxy voting advice could qualify as a misleading statement under the federal proxy rules. *See id.*

The Commission gave the public a mere 30 days to comment on the Proposed 2022 Rule, *see* 86 Fed. Reg. at 67,383—a period that was half as long as the comment period underlying the 2020 Rule. The 30-day comment period ran from November 26 to December 27, thus falling squarely within the year-end holiday season. *See id.* And it came "at a time when the Commission currently ha[d] comment periods open for nine different proposals, many of which also affect[ed] the same parties who wish[ed] to provide substantive input on" the Proposed 2022

Rule. Representatives Bryan Steil and Bill Huizenga, Letter to SEC on Proxy Voting Advice Amendments (Feb. 2, 2022).

Given the unnecessary constraints imposed by the Commission's artificially short comment period, a number of commenters formally requested that the Commission extend the period to allow members of the public to weigh in on the Commission's new proposal. *See, e.g.*, U.S. Chamber of Commerce's Center for Capital Markets Competitiveness, Letter to SEC on Proxy Voting Advice Amendments (Nov. 30, 2021); American Securities Association, Letter to SEC on Proxy Voting Advice Amendments (Dec. 3, 2021). The Commission never responded to those requests, and the comment period closed after 30 days.

Not surprisingly, the public comments on the Proposed 2022 Rule were few, especially compared to the robust comments on the Proposed 2020 Rule. The Commission received only 61 comments during the 30-day period. *See Comments on Proposed Rule: Proxy Voting Advice*, Release No. 34-93595; File No. S7-17-21, *available at* https://www.sec.gov/comments/s7-17-21/s71721.htm. The majority of the comments opposed the Proposed 2022 Rule. *See, e.g.*, Nasdaq, Letter to SEC on Proxy Voting Advice Amendments (Dec. 27, 2021) (expressing concern that the Proposed 2022 Rule "undermines the transparency provided by the [2020] Rule by repealing carefully tailored mechanisms that balanced the need for accurate

information with the demand for timely and objective voting advice").[5]    SEC

officials also conducted just three meetings with members of the public regarding

the Proposed 2022 Rule.  *See Comments on Proposed Rule:  Proxy Voting Advice*,

Release No. 34-93595; File No. S7-17-21, Meetings with SEC Officials, *available*

*at* https://www.sec.gov/comments/s7-17-21/s71721.htm.

The limiting effect of the truncated comment period on the public's ability to

comment was not lost on the Commissioners or the public.   One of the active

Commissioners noted the "needlessly compressed" comment period and observed

that it "likely deterred some interested persons from submitting comment letters"

and "may have resulted in the Commission only seeing a narrower picture of the

public concerns and failing to capture relevant data and perspectives."   Mark T.

Uyeda, Commissioner, U.S. Sec. & Exch. Comm'n, *Statement on Proxy Voting*

*Advice Proposal* (July 13, 2022), *available at* https://www.sec.gov/news/statement/

uyeda-statement-amendments-proxy-voting-advice-071322.   And two U.S. Senators

cited the Commission's actions as the "most egregious example of the SEC's failure

---

[5] Again, some of those comments came from *amici* here.  *See* J.W. Verret, Letter to
SEC on Proxy Voting Advice Amendments (Dec. 21, 2021) (explaining that the
Proposed 2022 Rule would be "unlikely to survive legal challenge if ultimately
adopted"); Paul Rose and Christopher J. Walker, Letter to SEC on Proxy Voting
Advice Amendments (Dec. 22, 2021) (stating that "[t]he proposed amendments
would rescind two of the most important provisions in the final rule," thus
jeopardizing the rule's "goal of producing transparent, accurate, and complete
information for investors").

to provide adequate time to comment" of which they were aware.  Letter from Senators William Hagerty and Tom Tillis to Chairman Gary Gensler (July 12, 2022), *available at* https://www.hagerty.senate.gov/wp-content/uploads/2022/07/2022-07-12-Gensler-Private-Funds-Letter.pdf.

The Commission issued the final 2022 Rule on July 13, 2022.  *See Proxy Voting Advice*, 87 Fed. Reg. 43,168 (July 19, 2022).  In contrast to the 2020 Rule, which reflected substantial concessions as a result of the extensive dialogue between the Commission and the public, the 2022 Rule was materially unchanged from the Proposed 2022 Rule.  *See id.*; *see also* Paul Rose & Christopher J. Walker, Report for U.S. Chamber of Commerce, *Examining the SEC's Proxy Advisor Rule* 28 (Nov. 2020).

## III.    The Commission Violated The APA

The APA "requires agencies to engage in 'reasoned decisionmaking.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)).  "An agency may not, for example, depart from a prior policy *sub silentio*." *Fox*, 556 U.S. at 515.  Rather, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 516.  In addition, agencies must "use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance"—here, notice and comment rulemaking.  *Perez v.*

*Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) (citing *Fox*, 556 U.S. at 515); *accord, e.g.*, *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017) ("[A]n agency issuing a legislative rule is itself bound by the rule until that rule is amended or revoked and may not alter such a rule without notice and comment." (citation omitted)).

In issuing the 2022 Rule, the Commission violated those bedrock APA requirements. *Amici* will focus on two of the APA problems that Appellants' brief details: (1) a lack of reasoned explanation for the Commission's change of course, and (2) a lack of adequate time for commenters to address the Proposed 2022 Rule.

First, the Commission did not adequately explain its abrupt decision to abandon the 2020 Rule and issue a new rule that rolled back several of the 2020 Rule's reforms. *See Fox*, 556 U.S. at 515. The Commission announced, before that rule had even gone into effect, that the Commission would not enforce that rule and planned to replace it.[6] But the 2020 Rule certainly could not have created any unexpected burdens or unforeseen consequences prior to its effective date.

Moreover, when the Commission issued the 2022 Rule, the Commission had no new evidence before it about any relevant topic. The Commission has never

---

[6] As noted, that announcement has now been held to have been arbitrary and capricious. *See NAM v. SEC*, No. MO:21-CV-183-DC (W.D. Tex., Sept. 28, 2022), Order Granting Mot. for Summary Judgment (Dkt. 47), at 3. The Commission did not appeal that ruling.

identified any changed circumstance that might have justified its change in course—and none is apparent, except, of course, for a change in the composition of the Commission itself. In short, there is nothing in the administrative record, or anywhere else, that could have reasonably led the Commission to "call into question" its own "recently adopted requirements." Statement of Commissioners Hester Peirce and Elad Roisman (June 1, 2021), *available at* https://www.sec.gov/ news/public-statement/peirce-roisman-response-statements-application-proxy-rules-060121.

In the course of adopting the 2022 Rule, the Commission attempted to justify its decision to undo the 2020 Rule only by pointing to information that the Commission *had already considered* in issuing the 2020 Rule. The Proposed 2022 Rule noted (1) certain investors' "strong concerns" regarding the 2020 Rule's potential effect on the "independence, cost and timeliness" of proxy voting advice, and (2) the proxy advisory industry's development of voluntary "best practices." 86 Fed. Reg. at 67,384, 67,391. But proxy advisory firms had raised both points in comments in the lead-up to the 2020 Rule, and the Commission responded to them in that rule. The Commission noted the concerns that had been raised about effects on proxy voting advice and carefully explained why those concerns did not provide an adequate reason for continuing to tolerate a proxy advisory process that lacked transparency and was subject to error that companies had no opportunity to correct.

*See* 85 Fed. Reg. at 55,085, 55,097-101, 55,104-107, 55,112. The Commission also explained why the existence of voluntary "best practices" did not obviate the need for federal regulation, stating that voluntary and other "regulatory regimes serve distinct, though overlapping, regulatory purposes." 85 Fed. Reg. at 55,131-132. "An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate," *Fox*, 556 U.S. at 537 (Kennedy, J., concurring)—but that is exactly what the agency did here in re-raising these points without even acknowledging its own prior determinations about them.

The district court held that *Fox* does not apply on the ground that the Commission's about-face regarding the risks to proxy advice posed by the 2020 Rule "was not a 'factual finding' but a policy decision that weighed the same factual record differently." ROA.1022-1024. But the district court's opinion conflated the underlying factual *record* with the Commission's factual *findings* based on that record. The two concepts are distinct: the factual record is the evidence before the agency, while factual findings are the conclusions the agency draws from that evidence. Finding of Fact, *Black's Law Dictionary* (11th ed. 2019) (a finding of fact is a "determination by a judge, jury, or administrative agency of a fact supported by the evidence in the record").

The Commission's original conclusion that the 2020 Rule did "not create the risk that [proxy voting] advice would be delayed or that the independence thereof would be tainted," ROA.207, 2020 Rule, 85 Fed. Reg. at 55,112, was a factual finding that could not be disregarded without explanation under *Fox*. Yet the Commission did just that when it found, on the same record and without justification, that "that the risks posed by the [2020 Rule] to the cost, timeliness, and independence of proxy voting advice" justified its reversal. ROA.132, 2022 Rule, 87 Fed. Reg. at 43,175. The Commission's actions "trigger[ed] the arbitrary-and-capricious rule set forth in *Fox*," requiring the Commission to "explain why" its prior factual findings "were mistaken, misguided, or the like." *Texas v. Biden*, 20 F.4th 928, 991 (5th Cir. 2021). But the Commission "failed to give a 'detailed' (or any) discussion of the prior findings." *Id.* The Commission's unexplained departure from its previous factual findings is a textbook example of arbitrary and capricious agency action. *See id.*; *see also Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1139 (5th Cir. 2021) (agency action was arbitrary and capricious where agency "turned around and ignored its prior" findings and "failed to adequately explain this change").

It is particularly egregious for the Commission to have walked away from the 2020 Rule without adequate explanation given all the care and resources that the Commission and the affected parties poured into the development of that rule over the course of a lengthy and bipartisan process. The Commission's lack of

explanation here would violate the APA even absent that factual backdrop—but the Commission's course of action is particularly arbitrary in light of it.  The more careful the consideration that the Commission gave its regulatory approach the first time around, the more the Commission must explain why a change was warranted.  And, more generally, given the Commission's critical role in the U.S. economy, it is crucial for the Commission to make decisions based on neutral evaluations of the law and the facts.  Here, in issuing the 2022 Rule the Commission offered essentially nothing more than the unexplained and unverified preferences of its changed leadership.

Second, the Commission violated the APA's procedural requirements by rushing the 2022 Rule through an artificially accelerated regulatory process that afforded no opportunity for meaningful public comment.  The Commission gave the public just 30 days—half the comment period for the Proposed 2020 Rule—to weigh in on the Proposed 2022 Rule.  That contradicts longstanding administrative practice implementing the APA's requirement that an agency considering a binding legislative rule "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments."  5 U.S.C. § 553(c).  Indeed, Chairman Gensler recently testified that the Commission "*always*" provides the public with "at least two months" to comment on proposed regulations. House Appropriations Subcom. on Fin. Servs., *Hearing on the Fiscal Year 2023*

*SEC and Federal Trade Commission Budget Request* (May 18, 2022) (emphasis added); *see* Letter from Senators Hagerty and Tillis to Chairman Gensler (July 12, 2022). The Administrative Conference of the United States recommends that agencies offer a public comment period of at least 60 days. *See* Administrative Conference of the United States, Rulemaking Comments, Recommendation No. 2011-2 (June 16, 2011). And the Executive Branch has consistently recognized for decades that "a meaningful opportunity to comment . . . should include a comment period of not less than 60 days." 58 Fed. Reg. 51,735 (Sept. 30, 1993); *see, e.g.*, Executive Order 13258, 67 Fed. Reg. 9385 (Feb. 26, 2002); Executive Order 13563, 76 Fed. Reg. 3821 (Jan. 18, 2011); *see* Memorandum for the Heads of Executive Departments and Agencies, *Modernizing Regulatory Review*, 86 Fed. Reg. 7223 (Jan. 20, 2021).

Given that longstanding practice, and based on the experience of the *amici* who have been intimately involved with the Commission's workings, the Commission's 30-day comment period here was "unreasonably short" and therefore inadequate. Letter from Senator Pat Toomey & Representative Patrick McHenry to Chairman Gary Gensler (Jan. 10, 2022); *see, e.g.*, *Rural Cellular Ass'n*, 588 F.3d at 1101. The unreasonableness of that deviation from Commission practice is effectively demonstrated by the fact that the Commission received only 61 comments on the Proposed 2022 Rule (in contrast to the more than 650 comments it

received on the Proposed 2020 Rule) and held only three meetings with interested parties (in contrast to the 84 meetings it held in connection with the Proposed 2020 Rule). *See* pp. 12, 17-18, *supra*. It is unlikely that those who submitted comments on the Proposed 2020 Rule lacked interest in the Proposed 2022 Rule; it is more likely that the truncated year-end comment period failed to provide them adequate time and notice to make their views known to the Commission.

The district court refused to inquire into the Commission's abbreviated comment period because it concluded that the *Vermont Yankee* doctrine prohibited it from "impos[ing] upon [the] agency its own notion of which procedures are 'best.'" ROA.1030-1031 (quoting *Perez*, 575 U.S. at 102); *see Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978). But *Vermont Yankee* merely "stands for the general proposition that courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990). It does not prevent courts from interpreting and applying procedural requirements that *do* appear in the text of the APA, as the requirement to give interested persons an opportunity to participate does. *See Ass'n of Nat'l Advertisers*, 617 F.2d at 619 n.10 (*Vermont Yankee* "has no bearing on the power of courts to interpret and apply congressional directives"). And it certainly does not require courts to rubber-stamp agency actions, like the Commission's here, that fall far short of providing the

26

"meaningful opportunity" for comment required by the APA. *Rural Cellular Ass'n*, 588 F.3d at 1101.

Of course, the whole point of notice-and-comment rulemaking is to "give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments." 5 U.S.C. § 553(c). That allows the agency to take those comments into account, thereby "maintain[ing] a flexible and open-minded attitude" that focuses on the best interests of regulated parties and the public. *N. Carolina Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 763 (4th Cir. 2012). The Commission followed the required processes—and, indeed, undertook more steps than required—in issuing the 2020 Rule. But it flouted those processes in issuing the 2022 Rule, as to which the agency had plainly made up its mind before it received even a single comment.

# CONCLUSION

For the foregoing reasons, *amici* respectfully submit that the Court should reverse the judgment of the district court with instructions to vacate the 2022 Rule.

Dated:  January 13, 2023

>  */s/ Elaine J. Goldenberg*
> Donald B. Verrilli, Jr.
> Elaine J. Goldenberg
> MUNGER, TOLLES & OLSON LLP
> 601 Massachusetts Avenue NW
> Suite 500 E
> Washington, DC 20001
> Tel:  (202) 220-1100
> Donald.Verrilli@mto.com
> Elaine.Goldenberg@mto.com
>
> Virginia Grace Davis
> MUNGER, TOLLES & OLSON LLP
> 560 Mission Street
> San Francisco, CA 94105
> Tel: (415) 512-4000
> Grace.DavisFisher@mto.com
>
> *Counsel for Amici Curiae Former SEC Officials And Law Professors*

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


        */s/ Elaine J. Goldenberg*
Elaine J. Goldenberg

*Counsel for Amici Curiae Former*
*SEC Officials And Law Professors*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,904 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

 */s/ Elaine J. Goldenberg*
Elaine J. Goldenberg

*Counsel for Amici Curiae Former SEC Officials And Law Professors*